IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 4:09CR39 |
| | ) | |
| | ) | |
| CHADRIQUEZ WILLIAMS | ) | |

**CHADRIQUEZ WILLIAMS' COMPREHENSIVE MEMORANDUM IN
SUPPORT OF COMPASSIONATE RELEASE, WHETHER BASED ON THE
EARLIER 2021 MOTION OR ON THIS PRESENT MEMORANDUM,
<u>CONSTRUED AS A NEW MOTION</u>**

Chadriquez Williams, the defendant, through undersigned counsel, respectfully

provides the following points and authorities in support of a grant of compassionate

release. This memorandum is being filed in response to the government's opposition to Mr.

Williams' request to withdraw and refile his previously-filed 2021 compassionate release

motion.

Counsel requests that the Court either grant Mr. Williams' motion to withdraw his

2021 compassionate release motion and construe this memorandum as a new compassionate

release motion, or deny the motion to withdraw the 2021 compassionate release motion,

construe this memorandum as providing additional grounds for compassionate release, find

that "extraordinary and compelling reasons" are present justifying reconsideration of Mr.

Williams' sentence, weigh the sentencing factors to include his substantial post-conviction

rehabilitation, and reduce his sentence to one of no more than 130 months or time served.

## I.   <u>Table of Contents</u>

**II. Facts and Procedural Background** ................................................................. 3

**III. Administrative Exhaustion** .......................................................................... 8

**IV. Claims Raised In Mr. Williams' Original Compassionate Release Motion** ............. 9

   a. Mr. Williams Would Not Be A Career Offender Today Because Since The 2018 Farm Act, His 2009 Instant Offense Of Marijuana Possession With Intent to Distribute Is No Longer Considered A Controlled Substance Offense ........................................................ 10

   b. Under Current Sentencing Norms, Career Offender Guideline Sentences Have Become The Exception Rather Than The Rule ........................................................................ 12

**V. Mr. Williams' Additional Grounds Supporting His Original Claim** ....................... 13

   a. Mr. Williams Is Not A Career Offender After *United States v. Campbell* 22 F.4th 438 (4th Cir. 2022) and *United States v. Hope* 28 F.4th 487 (4th Cir. 2022) ........................... 13

      i. The Virginia definition of "distribution" includes attempted distribution, and therefore falls outside the guideline definition of "controlled substance offense." ..................... 13

      ii. The Virginia definition of marijuana under which Mr. Williams was convicted is broader than and thus falls outside of the guidelines' definition of a controlled substance. ........................................................................................ 16

   b. The Career Offender Guideline Has Been Disproportionately Deployed Against African-American Defendants And Should Be Disregarded ................................................ 18

   c. Mr. Williams' Original Marijuana Convictions Were The Result Of Racially-Motivated Policing And Should Have Been Disregarded .......................................................... 24

      i. History of Marijuana Laws ....................................................................... 25

      ii. Disproportionate impact on the African American community ........................ 31

**VI. The Court Should Reduce Mr. Williams' Sentence to 130 Months** ...................... 34

   a. The Non-Career Offender Guideline He Would Face Today is 124-130 Months ............. 34

   b. The 18 U.S.C. § 3553(a) Factors ................................................................... 35

## II.    Facts and Procedural Background

On August 28, 2009, Mr. Williams attempted to sell less than two ounces of marijuana, and was robbed of all the marijuana by the purchaser. Mr. Williams unsuccessfully shot at the robber, and later in the day shot at the robber again, ultimately hitting a friend of the robber's in the thigh and finger. Because a conviction under 18 U.S.C. § 924(c) requires that a firearm be possessed *during* a drug trafficking offense, and at the time of the second shooting, Mr. Williams' possession of marijuana had long since ended, Mr. Williams today stands convicted of only the first shooting offense.

On November 12, 2009, a federal grand jury returned a three-count indictment naming Mr. Williams as the sole defendant. Mr. Williams was charged with possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841 (Count One); and two counts of possession of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts Two and Three).  On July 20, 2010, the government filed a notice seeking enhanced penalties pursuant to 21 U.S.C. § 851.  The § 851 notice stated that, if convicted of Count One, Mr. Williams faced an increased maximum penalty because he had previously been convicted of selling marijuana.  Mr. Williams proceeded to trial and was convicted on August 4, 2010, of all three counts.

Following the jury verdict, United States Probation prepared a presentence report, wherein it calculated Mr. Williams' guidelines range to be 438 to 444 months. Although Mr. Williams's total offense level based on his possession of marijuana was **8**, the reported noted that Mr. Williams had been previously convicted of selling marijuana in one series of events across two adjacent jurisdictions in 2005. Mr. Williams had only three criminal

3

history points.[1] Nevertheless, the report determined that Mr. Williams was a career offender, and applying USSG § 4B1.1(c)(2)(A), calculated that his guideline range was 438 to 444 months. This number was arrived at by adding the 18 to 24 months guideline Mr. Williams faced for possessing marijuana (Count One) to the guideline ranges established for the two § 924(c) convictions he obtained, which at the time were 120 months (Count Two) and 300 months (Count Three). Judge Wilson sentenced Mr. Williams to what he believed was a guideline sentence of 438 months. Mr. Williams filed a notice of appeal.

On appeal, counsel for Mr. Williams argued in his opening brief that Mr. Williams' 300-month sentence must be vacated because his possession of a firearm during the second set of events was not committed during a drug trafficking offense. *See* Brief of Appellant, *United States v. Chadriquez Williams*, No. 10-5131, Dkt 28. After Mr. Williams filed his opening brief on appeal, the government moved in the district court pursuant to Federal Rule of Criminal Procedure 48 to dismiss Count Three of the indictment, for which Mr. Williams had received 300 months. It purportedly did so because the Department of Justice had developed a new policy "that multiple violations of 18 U.S.C. § 924(c) may not be based upon a single predicate drug trafficking offense." Judge Wilson granted the government's motion and held a second sentence hearing. On October 18, 2011, the court recalculated Mr. Williams' guideline range to be 360 to life under USSG § 4B1.1(c)(3), and

---

[1] The PSR erroneously assigned Mr. Williams two criminal history points for being on probation at the time of the present offense. ECF No. 211 ¶ 28.  It is plain from the PSR itself, however, that Mr. Williams was not on probation at the time of the present offense. ECF No. 211 ¶ 26 (noting that probation terminated four months prior to instant offense).

applying the sentencing package doctrine, increased his sentence for Count Two, a now-single count of § 924(c), to a staggering 342 months. Together with Mr. Williams' 18-month marijuana sentence, the court imposed a total sentence of 360 months in prison.

On May 22, 2020. Mr. Williams filed a motion pursuant to the First Step Act of 2018, requesting appointment of counsel. This Court appointed the Office of the Federal Defender, who advised the Court that although Mr. Williams had no claim for relief under Section 404 of the First Step Act, the extraordinary lengthy sentence Mr. Williams was serving for his offense of conviction led counsel to believe that he may have a claim under the expanded compassionate release provisions of the First Step Act. At that time, the Fourth Circuit was considering whether that expanded compassionate release provision permitted consideration outside of those provided in the current version of the United States Sentencing Guidelines.  Ultimately, the Fourth Circuit determined that it did. *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020).

Between January and December 2021, undersigned counsel sought and obtained numerous extensions of time within which to file Mr. Williams' compassionate release motion. As the Court is aware, in this period, the Office of the Federal Public Defender represented dozens upon dozens of litigants as part of a deep review of ancient sentences that would not be imposed today, including "stacked" § 924(c) sentences and other statutory and guideline enhancements that have long since been amended. Nevertheless, undersigned counsel exceeded even the latest of the Court's kind extensions, and ultimately filed Mr. Williams' motion on December 14, 2021. Counsel has apologized, and apologizes again now, for the extraordinary length of time taken to file Mr. Williams' initial

compassionate release motion. For this delay, counsel holds both genuine regret and sole responsibility.

The 2021 delay, while being completely counsel's responsibility, was nevertheless occasioned by numerous factors. These include counsel's attempting to comprehend the perplexing procedural history in this case, which included one of the § 924(c) counts being vacated mid-appeal without any record indication of which count that was that was vacated. Additionally, counsel reached out to national counterparts and to the Sentencing Commission to attempt to understand how common it was for a defendant to ever receive a sentence above the mandatory minimum on a § 924(c) count – never mind a sentence of almost 30 years on a single count. At this time, counsel was learning of arguments being made elsewhere regarding the racially disparate application of the career offender guideline, and undertook to become familiar with that history and those statistics. [2] At the same time, arguments were just starting to evolve in the federal courts of appeal regarding which underlying offenses could be challenged as "controlled substance offenses." Put simply, counsel's learning curve was steeper than expected, but at the same time, counsel's failure to meet the Court's deadline was both regrettable and inappropriate.

Acknowledging this, counsel did then, and does now, believe that contrary to the government's suggestion, the Court should not in any way prejudice Mr. Williams for

---

[2] Citing *Kimbrough v. United States*, 552 U.S. 85 (2007), which concerned crack cocaine guidelines, government counsel says that arguments about racial disparity are as old as the hills and should not have contributed to filing delay. Counsel responds that arguments about racial disparities *in the career offender guidelines* have not historical been made, and to counsel's knowledge, have never been made in this district.

counsel's shortcomings. Mr. Williams is in no way responsible for or able to influence counsel's schedule or case load, and the government's suggestion that he should suffer the consequences of them is contrary to the interests of justice.

Following the filing of Mr. Williams' initial motion through counsel in December 2021, the government timely filed an aggressive but inapposite response. Among other claims, the government stated that because defense counsel had told government counsel that Mr. Williams wished still to supplement his claim with an argument regarding racial disparities in career offender sentencing, and wished to provide § 3553(a) factors for the Court to consider in its compassionate release calculus, that because counsel had not provided those arguments at the time of the government's filing, they could never be added later. In support of this claim, the government invoked rules against adding appellate claims in a reply brief, not applicable in the compassionate release motion context, and also rules against filing second or successive motions under Section 404 of the First Step Act, also not applicable in the compassionate release motion context. Following that filing, counsel filed a notice indicating an intent to answer the government's claims, and the Court issued a scheduling order directing counsel to file by a date in June, 2022.

While these filings were occurring, several developments continued. As stated before, Mr. Williams' teenage daughter suffered a catastrophic brain event in January 2022. Mr. Williams was moved to a different Bureau of Prisons facility. And two significant new cases, discussed below, were issued by the Fourth Circuit that directly further called into question Mr. Williams' original career offender designation. On that basis, in June 2022, counsel sought to withdraw the compassionate release motion counsel had filed six months

prior so that a comprehensive new motion could be filed that would save the Court from having to review the arguments piecemeal. The government has robustly opposed that motion to withdraw the original compassionate release motion, although it appears to oppose the withdrawal more on equitable rather than legal grounds. Among the claims in its opposition are that all of the arguments counsel seeks to raise now were available prior to December 2021. The government's opposition is both chary and ill-founded, since the most compelling ground for this Court to hold that Mr. Williams should be granted compassionate release, as explicated below, relies on two cases that have only been announced in the Fourth Circuit in 2022.

Ultimately, counsel respectfully asks this Court to decline the government's invitation to exalt form over substance, and to punish Mr. Williams for counsel's shortcomings. Because compassionate release motions under either statute or rule have no bar on supplementation or refiling, counsel submits that it does not matter whether the Court considers this present motion a final reply to the government's opposition to the motion to withdraw the 2021 motion or considers it a comprehensive statement of all of the known grounds supporting Mr. Williams' claim that he would not be a career offender today. Mr. Williams submits that the Court should take any approach that permits it to hear the arguments made below, which the interests of justice absolutely support the Court doing.

III.   **Administrative Exhaustion**

On September 1, 2020, Mr. Williams petitioned the Warden of FCI Williamsburg for a sentence reduction under § 3582(c)(1)(A). Bryan Dobbs, the Warden, denied that request

on September 25, 2020. Although Mr. Williams is now at FCI Manchester and has not

raised the arguments with specificity with the Warden of that facility, the government has

affirmatively stated on August 4, 2022 that the "the government does not raise exhaustion."

Gov. Opp. 8/4/22 at 2.

**IV.**     **Claim Raised In Mr. Williams' Original Compassionate Release Motion**

Mr. Williams' December 2021 compassionate release motion states that the Court

should grant him compassionate release because he would not be a career offender today,

created unwarranted sentencing disparities with any similarly-situated defendant being

sentenced under current law.

Section 3582(c)(1)(A), as amended by the First Step Act of 2018, vests this Court

with the authority to reduce a sentence if: (1) the defendant presents "extraordinary and

compelling reasons" warranting a sentence reduction; (2) a reduction would be consistent

with "applicable policy statements" issued by the Sentencing Commission; and (3) the

§ 3553(a) sentencing factors merit a reduction.  As the Fourth Circuit recently held,

however, there is currently no "applicable" policy statement governing § 3582(c)(1)(A)

motions filed by defendants.  *See McCoy*, 981 F.3d 271, 284 (quoting *United States v. Zullo*,

976 F.3d 228, 230 (2d Cir. 2020)).  In the absence of an "applicable" policy statement

governing motions filed by defendants, "district courts are 'empowered . . . to consider any

extraordinary and compelling reason for release that a defendant might raise.'" *Id.*

(emphasis in original); *see also United States v. Jones*, 980 F.3d 1098 (6th Cir. 2020) (same);

*United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020) (same).  The unique confluence of

factors in Mr. Williams' case, especially that he would not qualify as a career offender under

current law, presents "extraordinary and compelling reasons" for relief.

Judges, including this Court, have found "extraordinary and compelling reasons" to grant relief if the defendant was sentenced as a career offender but should not have been or would no longer be. *See, e.g.*, *United States v. Randy Melton*, 2022 U.S. Dist. LEXIS 4789 (W.D. Va. Jan. 3, 2022); *United States v. Michael Guthrie*, 2021 U.S. Dist. LEXIS 241361 (W.D. Va. Dec. 17. 2021); *United States v. Travis Jones*, 2021 U.S. Dist. LEXIS 154850 (W.D. Va. Aug. 17, 2021);  *United States v. Day*, 474 F. Supp. 3d 790, 806-07 (E.D. Va. 2020); *United States v. Derricoatte*, No. 1:11-cr-91-10, 2020 WL 5629095, at *4 (N.D. Ohio Sept. 21, 2020); *United States v. Wahid*, No. 1:14-cr-00214, 2020 WL 4734409, at *2 (N.D. Ohio Aug. 14, 2020); *United States v. Flakes*, No. 14-CR-214, ECF No. 1142 at 4 (N.D. Ohio July 20, 2020). In fact, in *United States v. Smith*, No. 14-CR-189-TSC, ECF No. 76 at 3-5 (D.D.C. May 14, 2020), the U.S. District Court for the District of Columbia held that the fact that the defendant no longer qualified as a career offender—even though the defendant's original sentence fell within the now-applicable, non-career-offender guidelines range—was sufficient on its own to establish an "extraordinary and compelling" reason for relief. *Id.* at 2-3.

### a. Mr. Williams Would Not Be A Career Offender Today Because Since The 2018 Farm Act, His 2009 Instant Offense Of Marijuana Possession With Intent to Distribute Is No Longer Considered A Controlled Substance Offense

Mr. Williams committed the federal offense of possession with intent to distribute marijuana in 2009, which was the offense that triggered the presentence report to designate him a career offender under Mr. Williams is not a career offender today because the offense

he committed in this case is not a "controlled substance offense."  U.S.S.C. § 4B1.2 defines

"controlled substance offense" as "an offense under federal or state law, punishable by

imprisonment for a term exceeding one year, that prohibits the manufacture, import, export,

distribution, or dispensing of a controlled substance (or a counterfeit substance) or the

possession of a controlled substance (or a counterfeit substance) with intent to manufacture,

import, export, distribute, or dispense."  The question of whether an offense qualifies as a

controlled substance offense is a categorical one – if the statute criminalizing the offense

covers substances outside of *See generally United States v. Bautista*, 989 F.3d 698 (9th Cir. 2021),

*as amended on denial of reh'g* (Feb. 26, 2021); *United States v. Williams*, 972 F.3d 364 (4th Cir.

2020); *Cucalon v. Barr*, 958 F.3d 245 (4th Cir. 2020) (citing *Castillo v. Holder*, 776 F.3d 262, 267

(4th Cir. 2015)).

At the time of his arrest, the federal offense of possession of marijuana with intent to

distribute include the criminalization of the possession of hemp – which is cannabis with a

Tetrahydrocannabinol (THC) level of not more than .3%. In December 2018, however,

Congress enacted the Farm Act, amended the federal definition of marijuana to exempt

hemp –Since Congress passed that amendment, Mr. Williams' federal conviction for

possessing marijuana with intent to distribute it in 2009 would now not be considered a

"controlled substance offense" that renders him eligible for the career offender designation.

*United States v. Batiz-Torres*, 562 F. Supp. 3d 28 (D. Ariz. 2021) (relying on *Bautista*, 989 F.3d

at 702) (holding that marijuana offenses that are categorically overbroad because they

criminalize hemp are not "controlled substance offenses" as defined in the United States

Sentencing Guidelines' career offender provision).

The government has stated that the United States Court of Appeals for the Fourth Circuit rejected this argument in *United States v. Ward*, 972 F.3d 364 (4th Cir. 2020). That opinion is completely unrelated to the question present here. Mr. Williams' claim here is that the *federal* offense of possession with intent to distribute marijuana today is broader than the *federal* offense of possession with intent to distribute marijuana in 2009. *Ward* concerns differences between state and federal drug schedules, and rejected the claim that if a state drug definition were broader than the federal drug definition, that the state offense would not qualify as a controlled substance offense. Put simply, *Ward* is just on a totally different topic, and of no use in this inquiry.

**b. Under Current Sentencing Norms, Career Offender Guideline Sentences Have Become The Exception Rather Than The Rule**

In his original petition, Mr. Williams also claimed that even if he would have qualified as a career offender if prosecuted today, the Court would be far more likely to grant a downward variance to persons who technically qualify as career offenders even if, with such priors as distribution of marijuana, their criminal history category vastly overstates their criminal history. Courts increasingly embraced their authority to grant substantial variances below the guidelines range, with the "anchoring effect" of the career-offender provision significantly diminishing over time. *See* U.S. Sent'g Comm'n, *Report to the Congress: Career Offender Sentencing Enhancements* at 23 (Aug. 2016) (hereinafter "*Report to the Congress*").[3]

Today, only 22.6% of defendants who qualify as career offenders receive sentences

---

[3] Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf.

within the career offender guidelines range.  U.S. Sent'g Comm'n, *Career Offenders Quick Facts, Fiscal Year 2019*.[4]  Nearly half of all career offenders receive a substantial below-range variance, with an average sentence reduction of 38%. *Id.* A 38% reduction in sentence from the 360 months Mr. Williams received would result in a sentence of no more than 224 months, more than a decade less than he is currently serving.

## V.      Mr. Williams' Additional Grounds Supporting His Original Claim

Mr. Williams argued in his original motion that he should be granted compassionate release because would not be a career offender today. Mr. Williams now provides the following additional reasons why that is the correct conclusion for the Court to reach.

### a.  Mr. Williams Is Not A Career Offender After *United States v. Campbell,* 22 F.4th 438 (4th Cir. 2022) and *United States v. Hope,* 28 F.4th 487 (4th Cir. 2022).

In addition to Mr. Williams not being a career offender because the federal definition of marijuana has rendered the prior federal definition of marijuana applicable at the time of sentencing overly broad, as originally argued in 2021, he is also not a career offender because his two Virginia marijuana predicates are also legally overbroad.

#### i.  The Virginia definition of "distribution" includes attempted distribution, and therefore falls outside the guideline definition of "controlled substance offense."

Courts review convictions categorically to determine whether they qualify as Career Offender predicates, focusing "on the elements, rather than the facts, of the prior offense."

---

[4] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Career_Offenders_FY19.pdf.

*United States v. Shell*, 789 F.3d 335, 338 (4th Cir. 2015). When applying the categorical approach, courts must identify "the most innocent conduct" covered by the offense and then determine whether that conduct satisfies every prong of the controlled substance offense definition. *Id.* at 339. Virginia Code § 18.2-248(A) makes it unlawful to "manufacture, sell, give, distribute, or possess with intent to manufacture, sell, give or distribute a controlled substance or an imitation controlled substance," and § 18.2-248.1 makes it unlawful to "sell, give, distribute or possess with intent to sell, give, or distribute marijuana." The Virginia Supreme Court has held that § 18.2-248(A)—and by extension the analogous § 18.2-248.1—is indivisible as to conduct. "§ 18.2-248(A), in our view, creates only a single offense, that being the unlawful manufacture, sale, transfer or distribution, or possession with the intent to manufacture, sell, give, distribute or possess certain controlled drugs." *Stillwell v. Commonwealth*, 219 Va. 214 (1978).

The United States Court of Appeals for the Fourth Circuit recently held that attempt offenses are categorically not "controlled substance offenses." *United States v. Campbell*, 22 F.4th 438, 443-45 (4th Cir. 2022). The text of the guidelines defines a "controlled substance offense" as an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense. U.S.S.G. § 4B1.2(a). Although the commentary to that definition provides that a "controlled substance offense" "include[s] the offenses of aiding and abetting, conspiring, and attempting to commit such offenses." U.S.S.G. § 4B1.2 n1,

*Campbell* states that because that commentary is inconsistent with the guideline itself, courts must apply the guideline as written may not rely upon the inconsistent commentary. *Campbell* at 443-45 (citing *Stinson v. United States*, 508 U.S. 36, 38 (1993)). "[T]he Sentencing Guidelines' definition of a 'controlled substance offense' does not include an attempt crime." *Id.* at 440.

The definition of "distribution" in the Virginia statute includes attempted transfer of controlled substances, and is thus categorically overbroad. In Virginia, "'[d]istribute' means to deliver . . . a controlled substance," while "deliver," in turn, "means the actual, constructive, *or attempted transfer* of" a controlled substance. Va. Code § 54.1-3401 (emphasis added). Thus because the least culpable conduct the Virginia statutes criminalize are these attempted transfers, Mr. Williams's Virginia conviction for distribution is not a "controlled substance offenses" under U.S.S.G. § 4B1.2(b). *Campbell*, 22 F.4th at 442, 444-45, 449; *see United States v. Locklear*, Jul 15, 2022 U.S. App. LEXIS 19588, 2022 WL 2764421 (applying *United States v. Campbell*, 22 F.4th 438 (2022) and holding that analogous North Carolina drug distribution conviction is not a "controlled substance offense" under the guidelines); Order, *United States v. Sprinkle*, 5:21-cr-00149 (S.D.W.Va. July 29, 2022) (same); Government's Response to Defendant's Objections, *United States v. Price*, 1:22-cr-01 (N.D.W.Va. July 20, 2022) ("Consistent with the government's position taken in other districts, Price's Ohio conviction for trafficking fentanyl is not a controlled substance offense because an "offer to sell," in violation of Ohio Code § 2925.03(A)(1), is an inchoate crime, not a completed distribution offense.").

ii. **The Virginia definition of marijuana under which Mr. Williams was convicted is broader than and thus falls outside of the guidelines' definition of a controlled substance.**

The next reason why Mr. Williams would not be a career offender today is because his original 2005 marijuana convictions under Virginia Code § 248.1 is not for a "controlled substance offense" because he was convicted using a Virginia statute with a marijuana definition that is categorically broader than the current Virginia marijuana definition, which has been amended to exclude hemp since 2019.[5] *See* Va. Code § 18.2-247(D) (2022) (excluding hemp). The Court may only use a prior conviction for distribution or possession with intent to distribute a controlled substance whose definition is coextensive with or narrower than the *current* definition applicable to that controlled substance. *Hope*, 28 F.4th at 499-504 (finding 2013 South Carolina drug conviction did not qualify as ACCA "serious drug offense" because "at the time of Hope's state convictions in May 2013, South Carolina defined marijuana as 'all species or variety of the marijuana plant' and did not exempt hemp or differentiate marijuana by its THC levels, the "least culpable conduct required to violate [the statute] would not be criminalized under the federal code."). To do otherwise is to sentence a person relying on old law, which is expressly forbidden. *See* 18 U.S.C. § 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11.

In 2005, when Mr. Williams was convicted of violating Virginia Code § 18.2-248.1, the

---

[5] Counsel is <u>not</u> asserting that the Virginia definition of marijuana is impermissibly broader than the federal definition. *See generally Ward*, 972 F.3d at 368-69; *see also United States v. Guerrant*, 849 Fed. Appx. 410 (4th Cir. 2021). The *Ward* decision dictates that the meaning of "controlled substance offense" in this case is determined by reference to the "drug schedules" from Virginia, the jurisdiction of Mr. Williams's prior conviction. *Ward* at 371.

hemp exclusion in the statute defining marijuana, § 18.2-247, was not present—meaning that "marijuana" at the time was defined broadly to include all types of hemp. Because the inquiry is categorical, the Court must look to whether a conviction for possession with intent to distribute hemp was legally permissible at the time—not whether Mr. Williams actually possessed hemp in his case. Because the "least culpable conduct required to violate [Virginia Code in 2005] would not be criminalized under the [Virginia] code" today, *Hope*, 28 F.4th at 504, Mr. Williams cannot be determined to have two qualifying career offender predicate offenses.

The First and Ninth Circuits have directly addressed this "time-of-conviction" versus "time-of-sentencing" question in the guidelines context. *United States v. Abdulaziz*, 998 F.3d 519 (1st Cir. 2021); *United States v. Bautista*, 989 F.3d 698 (9th Cir. 2021). Both courts concluded that the definition must turn on the drug schedules in effect at the time of sentencing, a result that flows both from the relevant text and from the underlying purposes of the federal sentencing guidelines. A time-of-sentencing approach accords with the relevant statutory and guidelines text. Both the sentencing guidelines and the federal sentencing statute requires courts to consult the sentencing guidelines "in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(4)(A)(ii); U.S.S.G. § 1B1.11. Citing these textual commands, the Ninth Circuit in *Bautista* rejected the government's argument that the courts must define "controlled substance offense" by consulting the law in effect "at the time of the prior state conviction." 989 F.3d at 703. Instead, because using current law resulted in a lower guidelines range, the court held that the term "controlled substance offense" must be defined using the law in effect "at the time of sentencing." *Id.* (emphasis in

original). The First Circuit reached a similar conclusion in *Abdulaziz*, reasoning that the relevant text provided a "fairly straightforward" answer to the which-version question by requiring the courts to consult the "drug schedules" in effect "at the time of s § 922(g) sentencing." 998 F.3d at 523.[6]

### b. The Career Offender Guideline Has Been Disproportionately Deployed Against African-American Defendants And Should Be Disregarded

In the late 1980s, a wide and continuously expanding gap began to form between the sentences of black individuals and those of other races. The expanding gap is the result of a number of factors, including then-newly, 21 U.S.C. § 851, and the career offender guideline, U.S.S.G. § 4B1.1, "that have a disproportionate impact on" black individuals and "serve no clear sentencing purpose."[7] In FY2019, 61.4% of the individuals classified as career offenders were Black—nearly three times their share of the overall federal defendant population.[8] The Sentencing Commission recognized this disparity over 15 years ago:

---

[6] The Sixth Circuit likewise relied on the controlling text in its unpublished decision in *United States v. Williams*, 850 F.App'x 393 (6th Cir. 2021). It reasoned that the "timing question" is answered by the "basic guidelines premise" that sentencing courts must use "the version of the Guidelines" in effect at the time of sentencing." 850 F.App'x at 397-98.

[7] *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, United States Sentencing Commission, 113-35 (2004) (Addressing the effect of the Career Offender Guideline) ("U.S.S.C. Report"), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchprojects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf.

[8] U.S.S.C., Individual Datafiles FY2019. Among all FY2019 individuals for whom the Commission received complete information, 20.7% were black, while 61.4% of those deemed career offenders were black.

> Despite the Commission's efforts to equalize the treatment of certain crimes, such "white collar" and "street" crimes involving similar economic harms, increasingly severe treatment of other crimes, particularly drug offenses and repeat offenses, has widened the gap among different offender groups. Today's sentencing policies, crystalized into the sentencing guidelines and mandatory minimum statutes, have a greater adverse impact on Black offenders than did the factors taken into account by judges in the discretionary system in place immediately prior to guidelines implementation. Attention might fruitfully be turned to asking whether these new policies are necessary to achieve any legitimate purpose of sentencing.

*Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, United States Sentencing Commission, 135 (2004) (highlights added). Across the country, the police arrest black people at much higher rates than whites for drug-related offenses. Yet, research has found that white people actually have a higher rate of illicit drug use.[9] And, the groups have approximately the same rate of drug sales.[10] Despite the fact that white and black Americans have about the same rate of drug sales, black Americans are arrested 2.7 times as often as white Americans for drug-related offenses, and 3.7 times more for marijuana possession.[11]

Results of a 2017 study revealed that white individuals were 25% more likely than black individuals to have their most serious charge dropped or reduced to a less-severe

---

[9] Rates of Drug Use and Sales, by Race; Rates of Drug Related Criminal Justice Measures, by Race, The Hamilton Project (last visited May 19, 2021), https://www.hamiltonproject.org/charts/rates_of_drug_use_and_sales_by_race_rates_of_drug_related_criminal_justice

[10] *Id.*

[11] *The War on Marijuana in Black and White: Billions of Dollars Wasted on Racially Biased Arrests*, ACLU Report (June 2013).

charge.[12] As a result, white defendants who faced initial felony charges were approximately 15% more likely than black defendants to be convicted of a misdemeanor instead.[13] white defendants with no prior convictions were over 25% more likely than black defendants with no prior convictions to receive charge reductions.[14]

In misdemeanor cases, the disparity is greater. white individuals facing misdemeanor charges were nearly 75% more likely than black defendants to have all charges carrying potential terms of imprisonment dropped, dismissed, or reduced to less severe charges.[15] white individuals charged with misdemeanors who had no prior criminal history were 46% more likely than similarly situated black individuals to have all charges carrying a potential prison sentence dropped or reduced to charges that carry no potential imprisonment.[16]

Since at least 2004, the United States Sentencing Commission has identified the career offender guideline as a source of significant, unwarranted adverse impact on black individuals sentenced in federal court.[17] The Commission suggested that black individuals are more often "subject to the severe penalties required by the career offender guideline."[18]

---

[12] *Research Finds Evidence of Racial Bias in Plea Deals*, Equal Justice Initiative, (Oct. 26, 2017), https://eji.org/news/research-finds-racial-disparities-inplea-deals/.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] U.S.S.C. Report at 133-134.

[18] *Id.*

20

Across the country, in fiscal years 2016 to 2020, there were 8,058 career offender cases. Of the 8,058 cases, 4,883 (60.7%) of career offenders were black, 1,737 (22.6%) were white, 1,268 (15.2%) were Hispanic, and 158 (1.4%) were other races.[19] This percentage is particularly high considering black individuals only make up 19.1% of all prosecutions in fiscal year 2020, and this percentage is "largely unchanged" from prior years.[20]



---

[19] Individual Offender Datafiles, United States Sentencing Commission, (FY 2016 – FY 2020), https://www.ussc.gov/research/datafiles/commission-datafiles. *See also* 2020 Annual Report and Sourcebook of Federal Sentencing Statistics, United States Sentencing Commission, at 54 https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annualreports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.

[20] 2020 Annual Report and Sourcebook of Federal Sentencing Statistics, United States Sentencing Commission, at 7 https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annualreports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.

In addition to finding that the career offender guideline has a disproportionate impact on black individuals, the Sentencing Commission report has found that the guideline advances no sentencing purpose when applied on the basis of prior drug convictions like Mr. Williams'. The Commission reported that the overall rate of recidivism for category VI offenders two years after release is 55%, but the recidivism rate for such offenders who are career offenders based on prior drug offenses is only 27%, and thus "more closely resembles the rates for offenders in lower criminal history categories in which they *would be* placed under normal criminal history scoring rules."[21]

This is particularly relevant because drug offenses make up the overwhelming majority of career offender cases.[22] The guideline originated with a statutory directive 28 U.S.C. § 994(h), enacted as part of the Sentencing Reform Act of 1984. The Sentencing Commission, however, did not follow the plain terms of this directive and expanded the class of career offenders to include numerous drug offenses not listed in the statute and to also include state misdemeanors subject to a statutory maximum of more than one year.[23] As the Commission noted, and as explained above, black Americans are more likely to have these prior drug convictions than similar white drug dealers, despite similar rates of drug sales, so the expansion of the guidelines by the Sentencing Commission has particularly

---

[21] *See* U.S.S.C. Report at 134 (emphasis in original).

[22] Nationally, 77% of career offender cases are drug cases. *Quick Facts Career Offenders*, United States Sentencing Commission https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quickfacts/Career_Offenders_FY20.pdf.

[23] USSG, App. C, Amend. 528 (Nov. 1, 1995).

harsh effect on black individuals facing sentencing hearings in federal court.[24]

More recently, in 2016, the Sentencing Commission has continued to note this disparity, including that the recidivist enhancement based on drug offenses does not serve the purposes of sentencing in 18 U.S.C. § 3553(a).[25] The Commission published its findings from a multi-year study of the career offender guideline.[26] In that report, the Sentencing Commission concluded and recommended to Congress that the career offender enhancement be amended – that it should *not* apply to those like Mr. Williams, who qualify for the enhancement based on prior "controlled substance offenses" alone.[27]

Rather, the Commission submitted that the enhancement should only be applied to those who have at least one prior conviction for a "crime of violence" as well as one other controlled substance offender or crime of violence.[28] The Commission based this conclusion on recent criticism of the career offender guideline, sentencing data, and its recidivism research.[29][55] Twelve years after the 2004 study, then, the Commission comes to the same conclusion about the utility of the career offender enhancement as applied

---

[24] U.S.S.C. Report at 133-134.

[25] *Id.*

[26] *See* Report to the Congress: Career Offender Sentencing Enhancements (Aug. 2016), *available at* http://www.ussc.gov/research/congressional-reports/2016report-congress-career-offender-enhancements.

[27] *See id.* at 3.

[28] *Id.*

[29] *Id.*

to prior drug offenses.

Despite advancing no sentencing purpose other than overbroad incapacitation, a career offender designation has a significant impact on defendants in that it drastically increases individuals' guidelines ranges. In fiscal year 2019, across the eight major offense types, the median sentence imposed was 141 months for career offenders.[30] That is 2.6 times the non-career offender median sentence of 54 months.[31] As the Sentencing Commission itself has said, "if a sentencing rule has a significant adverse impact and there is insufficient evidence that the rule is needed to achieve a statutory purpose of sentencing, then the rule might be considered unfair toward the affected group."[32]

This is particularly true in Mr. Williams' case, as the career offender guideline results in a more than 300% increase in his guidelines range, as shown below.

### c. Mr. Williams' Original Marijuana Convictions Were The Result Of Racially Disparate Policing And Should Have Been Disregarded

Because the origin of drug laws, and specifically marijuana laws, in the United States are deeply and inextricably race-affected, it can hardly be surprising that those same laws are still used to disproportionately target people of color.

The war on drugs, or more accurately described as the war on some classes of people

---

[30] *Individual Offender Datafiles*, United States Sentencing Commission, (FY 2019), https://www.ussc.gov/research/datafiles/commission-datafiles.

[31] *Id.*

[32] U.S.S.C. Report at 114.

who do some drugs, may have seemingly changed focus or rhetoric in the last century, but the common underpinning of that war has always been based on racism. During the 1920s, the original architect of the current Drug Enforcement Agency and whose enduring legacy has been the engineering of a moral panic in order to justify deeply racist reasoning and enforcement, would still recognize the ongoing war on drugs as continues today. Strains of the foundational racism can still be seen, especially when it comes to the enforcement of laws that were originally passed in order to control "inferior races and social deviants."[33]

### i. History of Marijuana Laws

In 1930, just as Prohibition was coming to an end, Harry Anslinger was appointed as the first commissioner of the Federal Bureau of Narcotics, which later became the Drug Enforcement Agency. He was also the first general of the war on drugs, and remained in that role for over 30 years and across five presidential administrations.

Prior to joining the FBN, Anslinger expressed the opinion that the allegations about marijuana making people violent or insane "an absurd fallacy. That opinion changed, however, when Anslinger had an agency to grow. The Federal Bureau of Narcotics had previously been the Department of Prohibition, but with alcohol legalized the agency needed a new enemy to fight. Anslinger focused his ire on marijuana. In order to ramp up the war on marijuana, Anslinger greatly exaggerated its effects. Marijuana was, he claimed, "more dangerous than heroin or cocaine," and "the most violence-causing drug in the history of

---

[33] Eric Schlosser, *Reefer Madness*, The Atlantic, August 1994, available at https://www.theatlantic.com/magazine/archive/1994/08/reefer-madness/303476/ (hereafter "*Reefer Madness* Atlantic article")

mankind."[34] "If the hideous monster Frankenstein came face to face with marijuana, he would drop dead of fright."[35]  He claimed young people were "slaves to this narcotic, continuing addiction until they deteriorate mentally, become insane, turn to violent crime and murder."[36] Moreover, he lied about the success of his war in order to keep Congress funding it.[37] This while he was fully aware that science didn't back his claims—after 29 of the 30 scientists he asked to study marijuana reported to him it was not dangerous, he championed the findings of the outlier study.[38]

But Anslinger's true talent was for stoking culture wars and moral panics around drugs based on white supremacist beliefs. From the outset, marijuana was painted as a threat to white American children and American society that was coming from people of color:

> The political upheaval in Mexico that culminated in the Revolution of 1910 led to a wave of Mexican immigration to states throughout the American

---

[34] Eric Schlosser, *Reefer Madness: Sex, Drugs, and Cheap Labor in the American black Market*, 23 (2004).

[35] *Id.*

[36] Cydney Adams, *The Man Behind the Marijuana Ban for all the Wrong Reasons*, CBS News (Nov. 17 2016), https://www.cbsnews.com/news/harry-anslinger-the-man-behind-the-marijuana-ban/.

[37] Nick Wing, *Marijuana Prohibition Was Racist From The Start. Not Much Has Changed*, Huffington Post (Jan. 14, 2014, 2:02 PM), https://www.huffpost.com/entry/marijuana-prohibition-racist_n_4590190 (citing Ryan Grim, *This Is Your Country on Drugs: The Secret History of Getting High in America* (2010)).

[38] Cydney Adams, *The Man Behind the Marijuana Ban for all the Wrong Reasons*, CBS News (Nov. 17 2016); https://www.cbsnews.com/news/harry-anslinger-the-man-behind-the-marijuana-ban/.

Southwest. The prejudices and fears that greeted these peasant immigrants also extended to their traditional means of intoxication: smoking marijuana. Police officers in Texas claimed that marijuana incited violent crimes, aroused a "lust for blood," and gave its users "superhuman strength." Rumors spread that Mexicans were distributing this "killer weed" to unsuspecting American schoolchildren.[39]

Anslinger capitalized on these racist fears by helping popularize the use of "marijuana" instead of the more common "cannabis," to tie the drug to anti-Mexican prejudice.[40]  His agency and its rhetoric were featured in the movie *Reefer Madness*, a piece of propaganda that perpetuated the myth that cannabis turns men to madness and violence and makes women sexually promiscuous and inevitable victims of sexual assault.[41] As current events changed, so did Anslinger's rhetoric to maintain marijuana's status as "Public Enemy Number One;"[42] during World War II, Anslinger accused the Japanese "of using narcotics

---

[39] *Reefer Madness* Atlantic article.

[40] In 1937, when Anslinger testified before Congress in the hearings that would result in the introduction of federal restrictions on marijuana his testimony included a letter from Floyd Baskette, the city editor of the Alamosa (Colo.) Daily Courier, which stated, "I wish I could show you what a small marihuana cigaret can do to one of our degenerate Spanish-speaking residents. That's why our problem is so great; the greatest percentage of our population is composed of Spanish-speaking persons, most of who [sic] are low mentally, because of social and racial conditions." Matt Thompson, *The Mysterious History Of 'Marijuana'*, NPR: Code Switch (July 23, 2013, 11:46 AM), https://www.npr.org/sections/codeswitch/2013/07/14/201981025/the-mysterious-history-of-marijuana.

[41] *Reefer Madness* (movie), dir. Louis J. Gasnier, (New Line Cinema 1936); Robert Solomon, *Racism and Its Effect on Cannabis Research*, Cannabis and Cannabinoid Research vol. 5,1 2-5 (Feb. 27 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7173675/.

[42] *Reefer Madness* (movie).

to sap America's will to fight," and after the war this allegation was pinned to Communists.[43]

Anslinger, however, had a focus that never changed over the course of his administration: using drug laws as a way to target African Americans. Anslinger was not racist only from a current-day perspective; his own state senator from Pennsylvania, Joseph F. Guffey, called for Anslinger's resignation for his widespread use of the "n" word in official memos.[44] Anslinger stoked white fears about people of color to foment support for his otherwise insupportable drug policies, asserting that "black people and Latinos were the primary users of marijuana, and it made them forget their place in the fabric of American society" and warned that marijuana use would lead to interracial mixing and black men attacking and impregnating white women.[45]

Quotes attributable to Anslinger include:

- "The primary reason to outlaw marijuana is its effect on the degenerate races."

- "Reefer makes darkies think they're as good as white men."

- "You smoke a joint and you're likely to kill your brother."

- "There are 100,000 total marijuana smokers in the U.S., and most are Negroes,

---

[43] *Reefer Madness* Atlantic article.

[44] David Breithaupt, *The First and Last Days of the War on Drugs: An Interview with Johann Hari*, LA Review of Books (Mar. 31, 2016), https://lareviewofbooks.org/article/the-first-and-last-days-of-the-war-on-drugs-an-interview-with-johann-hari/.

[45] Cydney Adams, *The Man Behind the Marijuana Ban for all the Wrong Reasons*, CBS News (Nov. 17 2016); https://www.cbsnews.com/news/harry-anslinger-the-man-behind-the-marijuana-ban/; David Breithaupt, *The First and Last Days of the War on Drugs: An Interview with Johann Hari*, LA Review of Books (Mar. 31, 2016), https://lareviewofbooks.org/article/the-first-and-last-days-of-the-war-on-drugs-an-interview-with-johann-hari/.

Hispanics, Filipinos and entertainers. Their Satanic music, jazz and swing result from marijuana use. This marijuana causes white women to seek sexual relations with Negroes, entertainers and any others."[46]

Anslinger's antipathy towards black people went hand-in-hand with his hatred of jazz.[47] Anslinger claimed that jazz was "evidence of a recurrence of the primitive impulses that lurk in black people, waiting to emerge. 'It sounded,' his internal memos said, 'like the jungles in the dead of night.' Another memo warned that 'unbelievably ancient indecent rites of the East Indies are resurrected'" in the jazz played by black musicians.[48] It was Anslinger who hounded Billie Holiday unto her death, while privately assisting white women like Judy Garland struggling with addiction in order to protect their "unblemished reputations."[49] This unequal targeting of people of color laid the groundwork for future models of enforcement.[50]

---

[46] Kyle Schmidlin, *'War on Drugs' Merely Fights the Symptoms of a Faulty System*, CBS News Column (Sept. 13, 2008, 7:19 AM), https://www.cbsnews.com/news/column-war-on-drugs-merely-fights-the-symptoms-of-a-faulty-system/.

[47] Johann Hari*, The Hunting of Billie Holiday: How Lady Day Was in the Middle of a Federal Bureau of Narcotics Fight for Survival*, Politico (Jan, 17, 2015), https://www.politico.com/magazine/story/2015/01/drug-war-the-hunting-of-billie-holiday-114298/.

[48] *Id.*

[49] *Id.*; see also Gabrielle Bruney, *"The United States vs. Billie Holiday" Tells A Story From the Racist Origins of the War on Drugs*, Esquire (Apr. 21, 2021), https://www.esquire.com/entertainment/movies/a35622823/united-states-vs-billie-holiday-true-story/; https://time.com/5638316/war-on-drugs-opium-history/.

[50] Alyssa Pagano, *How Racism Contributed to Marijuana Prohibition in the US*, Business Insider (Mar. 31, 2021 at 4:33 PM), https://www.businessinsider.com/racist-origins-marijuana-prohibition-legalization-2018-2.

From such an ignominious beginning, later politicians would continue to use the Anslinger framework of drug criminalization of for political ends. In 1971, Nixon declared his own "war on drugs." His aide and Watergate co-conspirator John Ehrlichman later admitted in an interview the real, and all-too-familiar, motivations behind the policy:

> The Nixon campaign in 1968, and the Nixon white House after that, had two enemies: the antiwar left and black people … We knew we couldn't make it illegal to be either against the war or black, but by getting the public to associate the hippies with marijuana and blacks with heroin, and then criminalizing both heavily, we could disrupt those communities.[51]

After Nixon, there was a brief opportunity for the United States to reassess its policy on the criminalization of marijuana and base subsequent regulations on science rather than racialized fears. In 1977, the DEA acknowledged that decriminalization was a policy worth studying, and Jimmy Carter asked Congress to decriminalize marijuana.[52] But after Ronald Reagan was elected and another war on drugs renewed for political ends, the DEA changed its narrative, calling marijuana the most urgent drug problem facing the United States.[53] Reagan signed an executive order creating a white House Drug Abuse Policy Office. The new head of this office was a chemist named Carlton Turner, who believed that "marijuana was an extremely dangerous drug—one that, among other things,

---

[51] Dan Baum, *Legalize It All: How to Win the War on Drugs*, Harper's Magazine, (April 2016), https://harpers.org/archive/2016/04/legalize-it-all/.

[52] *Reefer Madness* Atlantic article; *Carter Asks Congress to Decriminalize Marijuana Possession*, NY Times (Mar. 15 1977), https://www.nytimes.com/1977/03/15/archives/carter-asks-congress-to-decriminalize-marijuana-possession-cocaine.html.

[53] *Reefer Madness* Atlantic article.

might have the power to induce homosexuality."[54] Reagan's drug policies then relied on stereotypes of black people and bad science to justify the disproportionate targeting of people of color.[55]

Today, even while states are moving to reassess marijuana laws and move towards legalization, people of color, and black people specifically, are still disproportionately targeted, arrested, and incarcerated for marijuana possession.

### ii. Disproportionate impact on the African American community

In 2013, the ACLU published a report about the disproportionate impact of marijuana laws on the black community, looking at data from 2000 to 2010.[56] Entitled, "The War on Marijuana in black and white: Billions of Dollars Wasted on Racially Biased Arrests," the report found that, on average across the United States, "a black person is 3.73 times more likely to be arrested for marijuana possession than a white person, even though blacks and whites use marijuana at similar rates."[57] The racial disparities in marijuana possession arrests existed in every region of the country, regardless of density of population,

---

[54] *Reefer Madness* Atlantic article.

[55] *See e.g.*, Editorial Board, *A Woman's Right Part 4: Slandering the Unborn*, NY Times (Dec. 28, 2018), https://www.nytimes.com/interactive/2018/12/28/opinion/crack-babies-racism.html; Vann R. Newkirk II, *What the 'Crack Baby' Panic Reveals about the Opioid Epidemic*, The Atlantic (July 2017), https://www.theatlantic.com/politics/archive/2017/07/what-the-crack-baby-panic-reveals-about-the-opioid-epidemic/533763/.

[56] *The War on Marijuana in Black and White: Billions of Dollars Wasted on Racially Biased Arrests*, ACLU Report (June 2013).

[57] *Id.* at 4.

socioeconomic position, and percentage of black residents.[58]

While noting that the most recent War on Drugs initially "focused largely on relentless enforcement of heroin and crack cocaine laws in poor communities of color," the ACLU reported that with the waning of the crack epidemic of the 80s, law enforcement began shifting focus to marijuana to sustain arrest rates.[59] "Indeed, even as overall drug arrests started to decline around 2006, marijuana arrests continued to rise, and now make up over half of all drug arrests in the United States."[60] And those arrests continue to disproportionately target people of color, even though marijuana use is roughly equal between black and white people.[61]

The Commonwealth of Virginia is not immune to these trends. In 2010, Virginia was 12th of the states with the highest number of marijuana possession arrests, and had the 8th largest increase in marijuana arrests between 2001-2010, at 31.7%.[62] In fact, Roanoke City was the 12th county in the country for largest percent increases in marijuana possession arrest rates between 2001-2010, at 324%.[63]

---

[58] *Id.*

[59] *Id.* at 8.

[60] *Id.*

[61] "In 2001, 10% of whites and 9% of blacks reported using marijuana in the previous year. Those numbers increased to 12% and 14% respectively in 2010. However, arrests also target young people, and in every year from 2001 to 2010, more whites than blacks between the ages of 18 and 25 reported using marijuana in the previous year." *Id.* at 21.

[62] *Id.* at 42, table 2.

[63] *Id.* at 45, table 4.

These increasing arrests for marijuana possession mean an increasing number of black Virginians are being targeted by law enforcement. black people made up 19.8% of the population of Virginia, but constituted 43.4% of marijuana arrests in 2010.[64] These arrests are also specifically destroying the lives of young black people: in 2010, 77% of marijuana arrests were of people 29 or younger, 62% were of people younger than 25, and over one-third were of teenagers and even preteens.[65]

And despite national and local conversations about decriminalization and legalization over the past decade, the ACLU has found that the stark racial disparities remain. Between 2010 and 2018, a black person is still 3.64 times more likely to be arrested for marijuana than a white person, despite equal usage.[66] The Commonwealth of Virginia has not fared better, and regardless of recent legislative efforts has increased the racial disparity for marijuana arrests. Virginia increased its marijuana arrest rate by 33% between 2010 and 2018.[67] The racial difference between the black/white arrest ratio in Virginia in 2018 is 3.44%.[68] Even more troubling, that racial disparity *has been increasing*: the ratio for racial disparity of arrests in

---

[64] *Id.* at 54, table 8.

[65] *Id.* at 38, fig. 5.

[66] *A Tale of Two Countries: Racially Targeted Arrests in the Era of Marijuana Reform*, ACLU Report (2020) at 5.

[67] *Id.* at 23.

[68] *Id.* at 32.

2010 was 2.82%.[69]

### VI.   The Court Should Reduce Mr. Williams' Sentence to 130 Months

Prior to this offense, Mr. Williams' only criminal convictions were for the distribution of marijuana, offenses committed over a period of weeks when he was 21 years old, which he served a total of nine months and ten days in a local jail.

### a.  The Non-Career Offender Guideline He Would Face Today is 124-130 Months

The difference between Mr. Williams' sentencing guidelines as a career offender and a non-career offender is astonishing.  The career offender designation tripled Mr. Williams' sentence, adding two decades to it. This chart demonstrates the difference:

| Sentencing Calculations | | |
|---|---|---|
| | **Original Sentencing** 2010 | **Today** |
| Base Offense Level | 6 | 6 |
| Adjustment for Obstruction of Justice | +2 | +2 |
| Career Offender Adjustment | Yes | No |
| Mandatory Minimum | **120 months** (for discharging a firearm in the commission of an 18 U.S.C. § 924(c) offense | **120 months** (for discharging a firearm in the commission of an 18 U.S.C. § 924(c) offense |
| Criminal History Category | VI | II |
| Guideline Range in Months | **360 to Life** (§ 4B1.1(c)(3)) | **124 to 130 months** (120 months + 4-10 months) |

---

[69] *Id.* at 93.

34

Without that career offender designation, Mr. Williams' total offense level would be an 8, though he would still face a mandatory minimum sentence of 120 months for the possession of and discharging a firearm during and in relation to a drug trafficking offense. Today he would thus face a sentence of six to 10 months for possession of marijuana, plus a consecutive sentence of 120 months for the § 924(c), rendering his effective guideline to be 126 to 130 months rather than the 360 months to life that Judge Wilson used.

### b. The 18 U.S.C. § 3553(a) Factors

The § 3553(a) factors in this case support a sentence of 130 months. Although the government invites the Court to act as if Mr. Williams has been sentenced for a crime of violence with which he was never charged and on which the jury was never instructed, the actual offense of conviction is possession with intent to distribute marijuana, and possession of a firearm in relation to that marijuana possession.

Mr. Williams' prison disciplinary record is remarkably good, with no instances of violence or possession of the implements of violence. In addition, Mr. Williams has tremendous family support, and his family is particularly focused on his return since the traumatic brain injury his daughter suffered from which she has not remotely fully recovered. Mr. Williams has been incarcerated for over 13 years, had a previous almost nonexistent criminal history with a criminal history category of **2.** The factors support that 130 months is the sentence that neither overstate nor understate Mr. Williams' culpability and his the need for deterrence, punishment, and rehabilitation.

## **CONCLUSION**

For the foregoing reasons, Mr. Williams asks the Court to find that he has presented extraordinary and compelling reasons for a sentence reduction and to reduce his sentence to no more than 130 months or time served.

Respectfully Submitted,

JUVAL O. SCOTT
Federal Public Defender
  for the Western District of Virginia

CHRISTINE MADELEINE LEE
Virginia Bar No. 73565
Office of the Federal Public Defender
  for the Western District of Virginia
210 First Street SW, Suite 400
Roanoke, VA 24011
(540) 777-0880

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was electronically filed and will be forwarded to the Office of the United States Attorney this 18th day of August, 2022.

Christine Madeleine Lee